UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                            Case. No.  13-CR-20303

        Plaintiff,

                            HON. STEPHANIE DAWKINS DAVIS

v.

D-4 DWIGHT COATES,

        Defendant.
_____/

## **GOVERNMENT'S COMBINED RESPONSE AND BRIEF OPPOSING DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Now comes the United States of America, by and through its undersigned attorneys, and submits its response in opposition to Defendant's Motion for Compassionate Release (ECF 213).  Defendant Dwight Coates filed a *pro se* motion based on his current medical condition and the novel coronavirus pandemic (COVID-19).  He began serving his sentence of 110 months' imprisonment on April 16, 2015 and is currently housed at FCI-Oakdale.

Coates now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  While the government understands his concern regarding the onset of the COVID-19 pandemic, he does not satisfy the requirements for compassionate release, therefore his motion should be denied.

## BACKGROUND

Beginning in or about June 2011 and continuing up to and including April 2013, Coates, along with several co-defendants knowingly participated in a conspiracy to distribute illegal prescription opioid narcotics.  The scheme and pattern of illegal conduct involved Coates and others recruiting "patients" to have unlawful prescriptions written in their names and filled at various pharmacies throughout metro-Detroit.  The recruited "patients" did not have any real medical issues that warranted the prescriptions; however, the doctor would issue the "patients" highly addictive prescription opioids, which were in high demand and have significant "street value" on the illicit market. Once the prescriptions were issued and filled by cooperating pharmacists, Coates would then sell the pills at a substantial profit on the illegal street market.

On January 13, 2014, Coates pleaded guilty to the charged drug conspiracy; and on April 16, 2015, he was sentenced to a 110 month term of imprisonment and a three year term of supervised release.  His projected release date is January 24, 2023. Coates (age 47) suffers from hypertension and epileptic seizures.  On June 25, 2020, he filed a request for a Reduction in Sentence/Compassionate Release with the warden based on his hypertension and seizure disorder; his request   was denied on August 5, 2020. Coates then filed the instant motion with this Court requesting compassionate release based upon his medical conditions and the COVID-19 pandemic

2

## LEGAL STANDARD

A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for compassionate release, the district court may not act on the motion unless the defendant files it "after" either completing the administrative process within the Bureau of Prisons or waiting 30 days from when the warden at the facility received the request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, ___F.3d ___, No. 20-1298, 2020 WL 2845694, at *1 (6th Cir. June 2, 2020). And as the Sixth Circuit recently held, this statutory exhaustion requirement is mandatory. *Alam*, 2020 WL 2845694, at *1–*4. Coates has satisfied the exhaustion requirement.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy

statements incorporated by § 3582(c)(1)(A) is mandatory.  *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014).  To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release.  18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13.  As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public.  18 U.S.C. § 3553(a).

## ARGUMENT

The Court should deny Defendant's motion, because he does not satisfy the substantive requirements for compassionate release. "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Even assuming a defendant facing a heightened risk from Covid-19 could satisfy the criteria in § 1B1.13(1)(A) & cmt. n.1, Coates does not have a condition that places him at higher risk from Covid-19, therefore

he is ineligible for compassionate release.  Coates's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2).  Further, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support his release.

I.    **The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

     A.    **The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to prevent and combat the spread of COVID-19 within its facilities.  *Wilson v. Williams*, ___ F.3d ___, No. 20-3447, 2020 WL 3056217, at *2 (6th Cir. June 9, 2020).  Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread.  *Id*.  The Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from COVID-19, pose the least danger to public safety, and can safely be granted home confinement.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its COVID-19 Action Plan and minimize the risk of COVID-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website, https://www.bop.gov/coronavirus/covid19_status.jsp (last accessed September 3, 2020).  Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan.  *Wilson*, 2020 WL 3056217, at

5

*2.  To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities.  *Id.*  When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days.  *Id.*  Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for COVID-19 or being cleared by medical staff under the CDC's criteria.  *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures."  *Id.*  Staff and inmates are issued face masks to wear in public areas.  *See* BOP FAQs: Correcting Myths and Misinformation, https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf (last accessed September 3. 2020).  Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service.  *Wilson*, 2020 WL 3056217, at *2.  Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates.  *Id.*

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from COVID-19 completely at all facilities, despite its best efforts.  FCI-Oakdale currently has only two inmate COVID-19 positive cases.  *See* Bureau of Prisons COVID-19 Cases and COVID-19 Inmate Test

Information, https://www.bop.gov/coronavirus/ (last accessed September 2, 2020).

Accordingly, the Bureau of Prisons' measures have helped to protect federal inmates from COVID-19 and ensure that he and others receive any required medical care during these difficult times.

**B.     The Bureau of Prisons is increasing the number of inmates who are granted home confinement.**

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,660 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

1) Each inmate's age and vulnerability to Covid-19;

2) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19

8

and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting

9

Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. Coates fails to meet the requirements of compassionate release.

Defendant's motion should be denied as he fails to meet the requirements of compassionate release.

### A.      Coates is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A).  Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted.  28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory.  Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments.  *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2).  When Congress uses the same language in the same statute, it must be interpreted in the same way.  *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020).  In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute."  *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that.  It amended only *who* could move for compassionate release under § 3582(c)(1)(A).  It did not amend the substantive requirements for release.  *United States v. Saldana*, No. 19-7057, 2020 WL

11

1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020).  Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need.  That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50.  USSG § 1B1.13 cmt. n.1.

In support of his motion for compassionate release, Coates contends that his underlying medical conditions, hypertension and a seizure disorder, satisfies the criteria for compassionate release; but he is not eligible for compassionate release on this basis. Despite his argument to the contrary, he does not have any underlying medical conditions that would place him at a higher risk for severe illness as determined by the Centers for Disease Control (CDC). The medical records obtained from the correctional facility demonstrate Coates does suffer from seizures and hypertension (also known as high blood pressure); but notably,  he does not suffer from coronary disease.  Neither seizures nor high blood pressure, according to the CDC,  place him at a higher risk of severe illness from Covid-19. The CDC has found that the following underlying medical conditions place

individuals at a risk of severe illness from Covid-19: cancer, chronic kidney disease, COPD (chronic obstructive pulmonary disease), immunocompromised state (weakened immune system) from solid organ transplant, obesity (body mass index [BMI] of 30 or higher), serious heart conditions (such as heart failure, coronary artery disease, or cardiomyopathies), sickle cell disease, and Type 2 diabetes. CDC Website, People with Certain Medical Conditions. This list does not include regular hypertension or seizures.

According to the Mayo Clinic, high blood pressure (hypertension) is "a common condition" and can exist "for years without any symptoms," and essential hypertension "tends to develop gradually over many years." Mayo Clinic Website re: High Blood Pressure/Hypertension. It is a "a common condition as men get older"; "[a]bout one-third of men experience moderate to severe symptoms by age 60, and about half do so by age 80." Mayo Clinic Website re Benign Prostatic Hyperplasia (BPH).

So whether considered alone or in combination with the Covid-19 pandemic, Coates's medical condition does not satisfy the initial eligibility criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15, 2020).

The Covid-19 pandemic, by itself, does not qualify as the type of inmate-specific reason permitting compassionate release. The Bureau of Prisons has

worked diligently to implement precautionary measures reducing the risk from Covid-19 to Coates and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Coates is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." as provided in 18 U.S.C. § 3142(g)."  It thus prohibits the release of violent offenders, including most drug dealers.  *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020).  An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence."  *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).  So even many "non-violent" offenders—such as those involved in pill mill distribution conspiracies—may not be released under § 3582(c)(1)(A).  USSG § 1B1.13(2); *Knight*, 2020 WL 3055987, at *3 (finding a "patient recruiter" involved in a drug distribution conspiracy was a danger to the community).

14

Adhering to § 1B1.13(2) in this context is especially important in the midst of an ongoing opioid epidemic.  Unfortunately, the COVID-19 pandemic has not had any effect on decreasing the number of opioid pills that are hitting the streets. Patient recruiters and drug dealers, like Coates, still have access to medical professionals that will write medically unnecessary prescriptions in exchange for cash payments.  There are still real risks to public health and safety right now, and those risks will only increase if Coates is released into the community with access to deadly opioids to place on the street.

Because Coates's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A), rendering him ineligible for compassionate release.

## B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous (which Coates has not), he is still not entitled to compassionate release.  Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate.  *Knight*, 2020 WL 3055987, at *3 ("The § 3553(a) factors . . . weigh against [the] request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18

15

U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at

*6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18

U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States*

*v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's

denial of compassionate release based on the § 3553(a) factors). So even if the

Court were to find Coates eligible for compassionate release, the § 3553(a) factors

should still disqualify him.

Coates was involved in a very extensive opioid distribution conspiracy

involving a corrupt medical doctor, Dr. Mohammed Batayneh. The seriousness of

the offense cannot be understated. The defendant was a distributer of prescription

pain killers that, when used other than as intended for legitimate pain, often cause

serious side effects and death.  The conspirators, including Coates, operated Dr.

Batayneh's office as a pill mill wherein controlled substance prescriptions were

issued without medical necessity. Once filled, these pills were distributed on the

streets of Detroit and elsewhere and would often sell for $30 - $80 per pill; this

criminal organization operated just like crack is sold from a crack house.

Coatestrafficked a substantial amount of prescription pills, worth more than $1.4

million on the illegal street market, at the expense of people addicted to opioids.  It

is evident that had he not been caught, his criminal conduct would had continued.

Releasing him now would likely lead to him to engaging in the same

conduct as he garnered significant profits from the scheme. Placing him back into

the community at this time would serve none of the objectives codified in

§ 3553(a). Allowing a patient recruiter to be released "after only serving about a

third of his sentence would not promote respect for the law or proper deterrence,

provide just punishment, and avoid unwarranted sentencing disparities." *See*

*Knight*, 2020 WL 3055987, at *3.  And the Sixth Circuit has similarly held "the

need to provide just punishment, the need to reflect the seriousness of the offense,

and the need to promote respect for the law permit[s] the court to consider the

amount of time served in determining whether a sentence modification is

appropriate." *United States v. Kincaid*, 802 F. App'x 187, 188–89.

Coates's conduct had a significant and devastating impact on our

community.  It was an extremely serious offense that inevitably contributed to the

addiction and demise of countless people.  The 110 month sentence was imposed

to reflect the severity of his actions.  If he were to be released now, this goal of

sentencing would be completely lost.  Additionally, an early release would result in

a severe sentencing disparity among other similarly situated opioid pill distributors

and would be unlikely to deter Coates or other individuals from engaging in

similarly dangerous conduct in the future.

Because an early release at this time would not reflect the seriousness of the

offense, promote respect for the law, provide just punishment for the offense, or

deter others from committing similar crimes, the § 3553(a) factors weigh against

compassionate release.

17

I.   **If the Court were to grant Coates' motion, it should order a 14-day quarantine before release.**

If the Court were inclined to grant Coates' motion despite the government's

arguments above, the Court should order that he be subjected to a 14-day

quarantine at the facility, prior to his release.

## **CONCLUSION**

For the reasons set forth herein, the government respectfully request that the

Court deny Coates's Motion for Compassionate Release.


Dated: September 4, 2020                    Respectfully submitted,

                                            MATTHEW SCHNEIDER
                                            United States Attorney

                                            /s/ Regina R. McCullough
                                            Regina R. McCullough  (P64936)
                                            Assistant United States Attorney
                                            Chief, Health Care Fraud Unit
                                            211 Fort Street, Suite 2001
                                            Detroit, MI 48226
                                            (313) 226-9618
                                            Regina.McCullough@usdoj.gov

                                            /s/ Sarah Resnick Cohen
                                            Sarah Resnick Cohen
                                            Assistant United States Attorney
                                            211 Fort Street, Suite 2001
                                            Detroit, MI 48226
                                            (313) 226-9637
                                            Sarah.Cohen@usdoj.gov

**<u>Certificate of Service</u>**

I hereby certify that on the 4th, day of September, 2020, I caused a copy of the foregoing to be served on all counsel of record using the Court's ECF filing system.

<u>s/REGINA R. MCCULLOUGH</u>
Assistant United States Attorney
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9618
Bar No.: P64936